All right. Next case is in the interest of AT&T miners. We have Paige Straw and Patrick Daly. Ms. Straw. May it please the court, counsel, I'm Paige Straw and I represent Stephen Torbeck in the instant appeal. So we raised two issues in our brief. I'm going to focus on the first one unless there are questions about the second. And I want to start out by giving you just a general background about this case. I realize that my statement of facts is pretty lengthy in this case, and many of those facts might not immediately seem relevant to you when you drill down to the actual issues that were raised. But it was important to me that I give this court a background of how contentious this case has been from the day it was filed for shelter care until termination proceedings were actually completed. During this case, my client, the father of these two children, who is a non-offending parent, appealed virtually every decision there ever was made in this case. If he had the opportunity to appeal it, he did. Most of the time he was successful. Did he appeal those? Was he prosaic in those appeals? No. He had appointed counsel. Virtually every counsel in the entire county from which he comes from represented him at some point, either in the trial court or in the administrative appeals. It's kind of been a nonstop process with him. Let me just stop for one second. Was he in prison the entire time this child, from the time of the child's birth? The first child was I think maybe a little over a year old. I know he spent at least 11 months out of custody, 11 months of the older child's life, long enough to make the second child and her to be born, I believe, and then he was back in prison again. He visited, there was at least one or two prison visits early on before DCFS got involved. Okay. So there was a time period in which he lived with the older child, but not much at all with the younger child. And what's his outdate? Any day, actually. Early spring, maybe January, February. Of 18? Yes, I believe. You never know. Maybe it was last week and I just haven't heard that. But it's relatively soon. So he was an unpending parent. There had been an intact case. There was a lot going on. Shelter care was held. Even though everyone knew exactly where Mr. Torbeck was, they didn't bring him to that. They didn't have a renewal hearing. They just generally did not follow any of the procedures that happened in these sorts of cases at all. And the most important error is that they never, ever, ever wrote a service plan that included tasks for Mr. Torbeck. Now, the logic all along from DCFS was, what's he going to do in prison to get better? There aren't any services there, so why bother to put him in a service plan? Well, the reason you put him in a service plan is because the administrative code says you put him in a service plan, that everybody's entitled to one. That's why. He is to be given the opportunity to complete services that would address the issues that are present in this case. Now, granted, he can't address the issues that allowed the children to be taken in the first place because those original issues had to do with mom and mental health issues. She was unwell. And surprisingly, early on in this process, before anybody ever asked her to, she just decided to surrender her rights. And I think that kind of threw everybody off their game a little bit. Normally, the children would have been returned home to her when she completed the service plan, but she just kind of gave up midway. Now, what was her mental health issue? I thought, well, she couldn't go outside. Is that what it is? She's agoraphobic is one thing. I think there were several other issues. Is this the case where the one child was found at the car wash in diapers and a T-shirt? Yeah. And wet diapers. Yeah. And more than once, just out randomly around about town. Okay. Little big kids. Three-year-old or two-year-old? Maybe two at the time that it happened. And it wasn't good. And they tried with Intact Services, you know, to not take the children, but this kind of thing just kept happening, and ultimately they didn't have any choice. So she started out with the intent, it appears from the record, to work the service plan and get them home and then shows up one day and says, I surrender. I think they're better off where they are, so I quit. Well, Dad had never been a legit return home goal in the eyes of DCFS because he's incarcerated and he's not due to be let out for some time. So they just kind of ignored him. Even though he came to court, he was written each time, half the time he'd get there, fire his attorney and have to get a new one. Sometimes it wasn't his fault that the attorneys had to change, but it happened a lot. There was no continuity. One thing that was continuous is that he was always arguing that I want visits with my children, I want services, I want the things I'm entitled to have, and he just never got them, ever. But the important part here is they never gave him a service plan that would allow him to correct any of the conditions. The reason they actually terminated him was his depravity. Depravity is established by showing a series of convictions over a period of time. That's a rebuttable presumption. The state made that presumption by introducing certified copies of the convictions. How many times had he been committed to... He has three felony convictions. I don't believe that he went to prison the first time. And what were those for? The first one was a violation of an order of protection, so I'm pretty sure there's no prison on that one. Then possession of a meth precursor. I think it was a class four. And then an aggravated domestic battery, which is why he was in prison at the time all of this was going on. So after the state introduced the certified copies of the convictions to make the rebuttable presumption, it has been his job to rebut that presumption by saying or presenting evidence to show that he's not actually depraved. Now, that's what the service plan should have been directed to. Give him some anger management classes. Give him any of the myriad services that are available to these people. And he could have been working on those things. But DCFS just didn't think there was any point in doing that, so they flat refused to do it. This was brought up at hearing after hearing. It's not something that was overlooked. It was something that was requested. And they said, no, no, no, no, not going to do it. And they never did. He took classes on his own in prison. He did what he could, which actually is remarkable. I mean, it's not something I've seen very often. And when the DCFS caseworker testified about that, what do you know about what he's done, she said, I don't know. Well, could any of those classes have been valuable and useful to him? No, probably not. But she admitted that she really didn't know because she just didn't participate in that. He wasn't a real consideration, so she ignored him. Now, that would be one thing if there had not been procedure determination. Doesn't the progress of a service plan not apply for depravity as it does in the other cases? That's the state's argument, but there's not actually any authority for that. So it makes sense that it would be treated just like all the others. There's no authority either way. I couldn't find a case on it, and the state didn't find a case on it that addressed that directly. So I see no reason why it should be treated any differently than other bases for termination. The state even pointed out that some of the evidence that they could present, that a person could present, but the presumption is that he had made some rehabilitative efforts. Those can be made in prison. There are classes. There are educational opportunities. There are lots of things. No, you're not going to get an hour of psychotherapy a week. That's not going to happen. But there are certainly other programs that are available. We've seen it happen all the time. When people are released from prison, they've taken classes and done things that have helped move the ball along. He wasn't given that opportunity by DCFS, as he should have been. He did what he put on his own, and they didn't even bother to see if that was valid. They just decided it wasn't. How long under a service plan, how long do they give a parent to rehabilitate themselves to the point where the unfitness is an issue? They're not allowed to file for termination until more than nine months has passed, but quite often it's longer than that, depending upon what efforts have been made, what else is going on in the case. It's rare that you see it happen that quickly. So then if he was in custody and was not expected to be released beyond that period of time when probably there's still the ground that they can go for in the service plan, all the classes in the world, it wouldn't matter if he wasn't going to be released within that time frame that they were going to file for the unfitness. That's a potential situation, but because each case is handled differently based on the facts of each individual case, there's no way to say that, well, he never would have gotten it together before he was released, because how do we know? But would it matter if he'd gotten it together? Yes, it could have, because quite often they just don't file these petitions for quite some long time. They will allow a parent much longer than nine months to have an opportunity. But they have to wait for nine months, but they don't have to wait any longer. Correct. If he's not going to be released and he took every course that was offered and was the poster child for rehabilitating himself, states still could have filed after nine months and he would not be available for the return of the child. That is correct. He would not have been available for a return home goal at that time, but there is a big difference from being available for a return home goal and the termination of your actual parental rights. That is like the most severe outcome that can be had, is to interfere in a parent-child relationship. There is a lot of real estate between not returning home to him right this minute to terminating so that they never ever come home. Had they never proceeded with termination proceedings, I wouldn't be here arguing about whether or not he was given a service claim, because if they wanted to deny him one, so be it. But punishing him for not making improvements when they denied him the opportunity to do so was exactly what was talked about in Keonar, which is a third district case that is almost directly on point with this. Considering all of the efforts that he did go to, I mean from day one until today, not just with classes, but with fighting for his rights, asking for visits with his children, being denied repeatedly, appealing that. He took every step I have ever seen taken in one of these cases and yet the trial court would like us to believe it is all for naught like he's not going to be released last week. That's not what this is supposed to be about. This is supposed to be about the best interest of the children and a parent's right to raise their own biological children. And if we're going to have rules set forth by the Administrator Code about how these things are supposed to proceed, then we ought to follow those rules. That's what they're there for. And there are several cases that point out how important it is to not relax those rules just to get to a certain outcome. Once they find that he's unfit based on depravity, then the next issue is the best interest of the child. It's less to do with the father's rights or the mother's rights. So once they found that he was unfit due to the depravity, best interest certainly in this case from what I can see would lean towards removing this particular person from the child's life. Yes, and we did not take issue with the best interest hearing. Our position is that we never should have gotten there because he shouldn't have been found unfit in the first place without the service plan in place, which without that finding of unfitness, you never proceed to second stage best interest. I can't take any issue with the quality of the foster parenting in this case. I have no issue with that at all. This isn't about that. This is about the relationship between Stephen Torbeck and his two little girls and the fact that he's never, ever going to get one because DCFS didn't follow their own administrative code that they wrote and chose not to follow because they didn't think they should bother. And that's not how these cases should be handled. So we would ask that you would vacate the finding terminating his parental rights on the basis that he should not have been found unfit without a service plan being offered to him. If there aren't any questions, I don't have anything else. Thank you. Thank you. Good afternoon, Your Honors. May it please the Court, Counsel. My name is Patrick Daly. I'm here on behalf of the State. I want to start by focusing on our case and work my way from that. Before I do that, a couple of factual issues. Justice Welch asked the outdate. I looked at the DOC records before coming here today. He has an outdate of April 22, 2018. With regards to his criminal history, DOC records show that he had an 18-month sentence for his 2001 felony violation of border protection, an eight-year sentence for his 2005 possession of methamphetamine precursors in his current sentence of seven years for the aggravated battery and the strangulation of his children's mother. So I don't think more needs to be said about whether the State met its initial burden of establishing a primary case of depravity. K&R is a case that's favorable, but I think more favorable to the State than to the Respondent because I think it sort of frames the conceptual part of the purposes of the service plan and its context in terms of making progress reasonable progress. In this case, the Respondent in that case, the State had alleged both depravity and lack of reasonable progress. Much like this case, the Respondent there was not included in our State, was specifically given tasks in the service plan. The Court initially disposed of the depravity allegation, finding the State, among other things, had not established a conviction within five years of the filing of the petition to terminate, which is one of the prerequisites for a depravity finding. But second of all, then moved to the second allegation, whether there was proof that the Respondent made reasonable progress. There, the Court found that, I believe this terminology was paradoxical, that the State was able to establish a lack of reasonable progress when there was never any service plan tasks established for the Respondent to complete. Case law is abundant. In fact, it's in the Juvenile Court Act itself, when it discusses the various grounds for unfitness, that engaging in reasonable progress or the lack of reasonable progress is, among other things, to be assessed by a Respondent's compliance with the service plan. And that's the service plan's particular role. Here, in this case, the Court found that the State could not have established reasonable progress under that allegation  But the Court did make, I think, an interesting note, that the State could have established or attempted to argue that it can fit on the grounds of repeated incarceration. Repeated incarceration is very much like depravity. This is a situation where the State makes a privatization case based upon an establishment of certain facts. And I think that's kind of the point to be made here. This is not like a reasonable progress type of allegation. This is a depravity. Depravity is where the State introduces evidence to create a prima facie case. And in any instance where you have this rebuttable presumption, once the State makes that presumption, once it meets the qualifications for that, the burden then shifts to the Respondent to show that he had rehabilitated himself, that he had overcome this presumption of depravity. So what the argument here is, as I'm hearing this, is that the State is both required to establish depravity and required to give the Respondent the means in which to overcome that very presumption that form the basis for the State's case. And it's sort of an illogical premise, I think, in that it separates this type of allegation from, say, an allegation of lack of reasonable progress, where that burden is always going to be on the State, if you will, throughout those proceedings to the point of an allegation of unfitness to establish that lack of reasonable progress. Here the State already met its burden of showing unfitness, and that burden then shifted to the Respondent. Now, the second point I want to make in that regard is this. I think that there's a lot of commingling, if you will, of these concepts of progress and service plans and taking care of the kids. But what we're talking about here is actually not really related, well, in a tangential sort of way, of course, but not specifically directly related to the Respondent's interaction or the relationship with his children. It's related to the Respondent himself as an individual, as his ability to conform to moral standards. It's his progress in his own life that is actually the consideration under issue here. So I'm not, and this is not to argue that his relationship with his children is irrelevant. What I think is particularly relevant, in an almost paramount sort of way, is that's fine, you could be maybe a good dad, but you're a cruddy human being and you're going to go back to prison again because you can't conform your personal ability to integrate yourself into society, which is how, what's the end result? Why do we have depravity? This individual is a perfect, probably shining example of it. He's missed three times already. He's missed his kids' lives almost in their entirety. So, you know, it's understandable that that focus is going to be on the Respondent. So let me get to the third part of this then. Let's talk about these classes that he took, all right? He did argue that he had taken classes in, I believe I wrote them down here, a fatherhood initiative program, anger management, behavior modification. Counsel here mentioned anger management, and I want to sort of focus on that. He testified that he took an anger management course in prison during his 2005 sentence for the possession of a male feminine precursor, okay? So he goes to prison, he's being taught skills to control anger, and he gets out of prison and guess what happens? Yes, he strangles the mother of his children. So we can see that those programs that he's getting in prison are doing a really great job for him. Wasn't he also charged with several batteries while in prison? Yes, and that was the other part I was going to get to, Justice Barbera, is that even while in prison he had multiple violations of conduct within the prison, including some which involved acts of violence. These are facts that the Respondent himself did not deny. He had excuses for a lot of them, but he did admit that this had been a problem for him. So, I mean, really there's no reasonable court is going to probably view these circumstances in terms of what the focus is here, which is the Respondent's ability to conform himself to become a productive member of society. He's violent before he went into prison, he's still violent in prison, and there's actually nothing here to say that he's going to be anything less than violent when he gets out of prison. Counsel, is there any law that says, you know, a father, like in this case, who is charged with depravity is not entitled to a service plan? There's no law one way or the other that says that, no. There is a statutory requirement that a service plan be created. The courts have held that that requirement is directory, not mandatory, which means only here that the lack of it does not, in and of itself, negate any findings of unfitness. But typically in these cases which involve directory rather than mandatory, it then reverts to a prejudice type of analysis. And here the point would be there's certainly no prejudice here. I mean, you've got an individual who is demonstrably not rehabilitated. And even if he had been given, say, right carbs to your children, or do, you know, another drug and alcohol counseling, he wasn't conforming his standard, and he had not shown that when that state had met its initial burden of establishing depravity grounds. So in this regard, it's our position that it doesn't really matter whether he'd been given specific service task plans or whether DCFS was right or wrong to not include him because they felt he wasn't amenable to services because of his incarceration, which at that point was still going to be ongoing for several more years when this was initially before the court, that the court's finding of depravity was certainly justifiable factually and that when you focus on the fact that it's the respondent's burden to establish the lack of depravity and not the state to concurrently prove it and then help them disprove it, I agree that the judgment in this court was correct. If there had been an allegation of lack of reasonable progress, the respondent's argument based on K&R would be perfectly reasonable, but that's not the situation here either. I did not see either of your briefs reference to a case that maybe you or maybe not you're familiar with. NRA TA, the 4th District, it's a 2005 case that indicated that the felon, even with an unfitness where a court's unfitness finding is not based on the assessment of the parent's compliance with the dispositional order and neglect proceedings, even if the law that renders void an order entered therein has no bearing on a subsequent termination case. So doesn't that case kind of suggest that even if there was no service plan in the original unfitness hearing portion of the case, that regardless of that, they can still proceed to the next termination and not be affected by not having the service plan? I think it's sort of consistent with the position I'm saying. The service plan is a directory goal or a directory mandate. It's by statute. So it's not an indispensable part of the overall assessment of whether a parent is fit or not fit. So I have to look at that case to probably give you a better, more intelligent answer to it. But based upon your representation of his holdings, I think it's consonant with our argument that that is not in and of itself the grounds on which this court should send us back for more proceedings. Is there anything else, John? Thank you for your time. Thank you. Ms. Ross? Just very briefly, I have a few remarks. I think at the very beginning of this, the base level of this entire case, I think it's important to realize that the Juvenile Court Act is perfectly capable of writing in its statute that if a parent is incarcerated, he's not entitled to anything. They could write that, but they didn't. They didn't write that. And for us to rule that it's okay for DCFS to decide on their own that he's incarcerated, he's not entitled to anything, is overstepping their bounds. They have rules that tell them how to act. I also believe that the argument that the service plan is directory, not mandatory, my reading of the few cases that I read that address that issue is that that is directed towards the 45-day requirement, not whether or not a service plan is required, because there's dozens of cases about service plans being required, not directory. They're mandatory. So how do you, I guess, overcome the case that I just mentioned, MATA, where this court, on the unfitness, did not base its finding on his compliance with the service plan because there was no service plan, which even if everyone concedes that that was a requirement, there wasn't one, they didn't base it on that, they based it on depravity, and then they moved to terminate his rights. How do you rectify the district's ruling in that, to this scenario? Well, I know that I've read that case, but it's not coming back to me in the details of it, so I could distinguish the heck out of it, though. I'd find a way to distinguish it. I'm sure I could come up with a way to do it, and I'd be happy to write a supplemental position on that. If you would like us to do that, I certainly could. I can't really answer any better than that off the top right here. But if you would like me to, I'm happy to submit something on that. The next point I wanted to make is that the state argues that it doesn't make sense for a state to have to provide services to correct a condition that they are relying on to establish their depravity. Of course it does. They are required to provide services to correct every other condition that causes termination proceedings to begin. Why is this any different? Nowhere has anyone cited that depravity is different. I'm sure this situation has come up over and over and over again, and yet there's still no authority that says all the rules that apply to everything else don't apply to depravity. There's not any authority for that, so there's no reason for us to act as if there's an imaginary authority that says this is different. It's not different. It is a condition that is going to cause him to lose the rights to his children, just like any other condition, like perhaps he abused them. He would be sent to counseling. He would be sent to many other services. If he had a drug problem, he would be sent to treatment. He would be given opportunities. This is no different. The fact that he couldn't keep it together and he committed crimes over a long period of time is not different. The Juvenile Court Act could have called it different. They could have characterized it differently, but they chose not to. So it's not really the place of anyone else to do that for them. I also think it's important to recognize that, yeah, he had some bad conduct in prison. Well, why wouldn't he? He didn't have any services to help him get over it. Sure, he had some in 2005, and, yeah, he went to prison in 2001. His children weren't born until many, many, many, many years later. He testified at the termination hearing that things have changed now. I'm a father. I want to do better. I have a reason to act right. He hasn't been given many skills to do that. He did testify in some detail about, yeah, he'd gotten in trouble a couple of times, but listen to the things he had avoided with what he had learned in his anger management classes during this round. And in the courses that he had taken about the fatherhood initiative, he had learned how to defuse some situations, and he gave some examples of situations that he has defused while in prison. Nope, he's not perfect. He's not going to be. It takes a long time to get better when you've had a lifetime of acting poorly. And he certainly didn't get any help from DCFS giving him the services that would have helped him do that. And this case is bigger than just Mr. Torbeck. This isn't just about this one dad who wasn't going to get out of prison in time to take care of his kids. This is about every single dad, every single mom who was incarcerated. And do they have the same rights? According to the Juvenile Court Act, they do because it doesn't say any differently. So I would ask that you would vacate that termination order and remand this for a service plan at the very least. Thank you. Thank you. Take this matter into consideration and issue a report as soon as possible. Thank you. Court is in recess until after lunch.